# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) ) | No. 75410-6-I |
| v. | ) ) | PUBLISHED OPINION |
| KENNETH LEE BUTLER, | ) ) | |
| Appellant. | ) ) | FILED: February 20, 2018 |
| | ) | |

DWYER, J. — After a stipulated bench trial, Kenneth Butler was found guilty of one count of possession of a controlled substance. He appeals, contending that the trial court erred by denying his motion to suppress evidence of methamphetamine and heroin discovered in his possession upon his arrest.

To resolve this matter, we must address whether Butler was unlawfully seized when a police officer commanded him to stop leaving the scene near a traffic stop, whether Butler's disregard of the police officer's show of authority terminated the seizure, and whether Butler was unlawfully seized when, soon thereafter, he was approached by a second police officer, accompanied by a tracking dog, who had been looking for him.

The state of both the briefing and the decisional law require that we analyze Butler's interaction with the police both as one continuous law

enforcement contact with him and as two separate such contacts. We conclude that, under either circumstance, Butler was unlawfully seized.

Accordingly, we reverse both the trial court's order denying the suppression motion and the judgment of guilt entered against Butler.

I

Officer David Allen was in his patrol vehicle parked on the side of a two-lane road when he noticed a pickup truck driving erratically toward a roundabout. Officer Allen observed the truck cross over a solid double-yellow line into oncoming traffic and nearly cause several collisions.

Officer Allen activated the emergency equipment on his marked police vehicle and initiated a traffic stop of the truck. In response, the driver of the truck pulled over to the side of the road. A few car lengths ahead of where the truck parked, a passenger vehicle also pulled over to the side of the road and parked. This vehicle had not been pursued by Officer Allen.

Officer Allen spoke with the driver of the truck. The driver stated that he was driving erratically because the passenger vehicle that had parked up ahead had hit his truck and then driven away.

Officer Allen began to approach the passenger vehicle and called out to its driver to see if anyone was injured. As Officer Allen approached, he observed that there were two other occupants in the passenger cabin, a man and a woman. When Officer Allen was three car lengths away from the vehicle, the two passengers emerged from the vehicle. The man began to slowly jog in the

opposite direction of Officer Allen. The woman followed after the man at a walking pace.

Officer Allen commanded the man and woman to stop. They did not comply. The man entered a nearby forested area to his right, while the woman continued walking down the road.

Officer Allen did not pursue either individual. Instead, he asked the driver of the passenger vehicle why the two may have fled, inquiring as to whether they might have had outstanding warrants for their arrest. The driver of the passenger car speculated, "[Y]eah, probably."

In response, Officer Allen announced over his police radio that a man and a woman had "fled" the scene of a traffic stop. Officer Allen's broadcast described the man as a Caucasian male wearing a gray jacket with a red stripe. Based on the information obtained from the car's driver, Officer Allen further announced that there were "probable warrants" outstanding for the man and the woman.

Shortly thereafter, while investigating the traffic incident, Officer Allen observed the male passenger walk out of the woods. The man noticed that his movements were being watched by Officer Allen. The man proceeded to walk across the two-lane road, heading away from the scene of the traffic stop. Officer Allen updated his radio broadcast by announcing the direction in which he saw the man walking.

Officer Derek Oates, a K-9 officer with a tracking dog in his patrol vehicle, was parked nearby. Officer Oates heard Officer Allen's radio broadcasts

regarding a fleeing suspect with a "probable warrant" and drove to Officer Allen's location. At the scene of the traffic stop, he spoke with Officer Allen and they agreed that, in lieu of deploying the tracking dog, Officer Oates would drive around looking for the "suspect."

While driving his patrol vehicle in the nearby area, Officer Oates observed a man who matched the description given by Officer Allen standing on the porch of a house, about to knock on an entry door.

Officer Oates parked his vehicle in front of the house. He exited his patrol vehicle and yelled out to the man, "[H]ey, come talk to me, buddy." The man complied, leaving the porch and approaching Officer Oates. Officer Oates asked the man for identification, which he provided. The man was Kenneth Butler.

Around this time, Officer Christopher Farley and another police officer arrived to assist Officer Oates. They parked their patrol vehicles in front of the home.

Officer Oates provided Butler's identifying information to police dispatch. The dispatcher advised Officer Oates that Butler had an outstanding arrest warrant. However, because Officer Oates had a police dog in his patrol vehicle's passenger cabin, he could not transport Butler from the scene.

Consequently, Officer Farley arrested Butler on the outstanding warrant. In a search of Butler's clothing following his arrest, Officer Farley discovered a syringe along with substances that were later determined to be methamphetamine and heroin.

Butler was charged with one count of unlawful possession of a controlled substance.

At a subsequent suppression hearing, Butler moved to exclude all evidence obtained after his arrest, arguing that he had been unlawfully seized during his encounter with the police. The trial court denied Butler's motion. The trial court concluded that Butler was unlawfully seized when Officer Allen commanded him to stop but that the unlawful seizure had ended when Butler left the scene and was no longer in the presence of a law enforcement officer. The trial court further concluded that Officer Oates's interaction with Butler was a second, independent police contact and that Officer Oates's exchange with Butler, prior to the confirmation of the arrest warrant, was a social contact, rather than a seizure.

Butler agreed to a bench trial on stipulated evidence. He was found guilty as charged.

II

Butler contends that the trial court erred by denying his motion to suppress the evidence obtained after his arrest because the search of his person following his arrest was the result of an unlawful seizure. The trial court erred, Butler avers, because he was either unlawfully seized by Officer Allen when he was told to stop leaving the scene near the traffic stop (and remained seized thereafter) or was unlawfully seized by Officer Oates when he was commanded to leave the porch and approach Oates's police vehicle.

A

To resolve these claims, we must determine whether Butler was seized, when he was seized, and whether the seizure was lawful. "Whether police have seized a person is a mixed question of law and fact." State v. Harrington, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). "The rule in Washington is that challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal." State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

> Under article I, section 7 [of the Washington Constitution], a person is seized " 'only when, by means of physical force or a show of authority,' " his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances, State v. Young, 135 Wn.2d 498, 510, 957 P.2d 681 (1998) (quoting State v. Stroud, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) and citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)), or (2) free to otherwise decline an officer's request and terminate the encounter, see Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); [State v.] Thorn, 129 Wn.2d [347,] 352[, 917 P.2d 108 (1996), overruled on other grounds by State v. O'Neill, 148 Wn.2d at 571]. The standard is . . . "a purely *objective* one, looking to the actions of the law enforcement officer." Young, 135 Wn.2d at 501 (emphasis added).

O'Neill, 148 Wn.2d at 574. "[T]he 'reasonable person' test presupposes an *innocent* person."[1] Bostick, 501 U.S. at 438.

The defendant "bears the burden of proving a seizure occurred in violation of article I, section 7." Harrington, 167 Wn.2d at 664; accord O'Neill, 148 Wn.2d at 574.

---

[1] The Constitution does not require the utilization of an objective "reasonable criminal" test.

Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," California v. Hodari D., 499 U.S. 621, 628[, 111 S. Ct. 1547, 113 L. Ed. 2d 690] (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in Terry v. Ohio, 392 U.S. 1, 19, n.16[, 88 S. Ct. 1868, 20 L. Ed. 2d 889] (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

Bostick, 501 U.S. at 434.

Previous Washington cases adopted the Mendenhall test of a seizure to analyze a disturbance of a person's private affairs under article I, section 7:

"A person is 'seized' within the meaning of the Fourth Amendment only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . There is a 'seizure' when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

State v. Stroud, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) (footnote omitted) (citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)), review denied, 96 Wn.2d 1025 (1982); accord State v. Thorn, 129 Wn.2d 347, 351-52, 917 P.2d 108 (1996).

Washington search and seizure law stemming from Terry and proceeding through Mendenhall is well-established.

Young, 135 Wn.2d at 510.

In Young, our Supreme Court confirmed that Mendenhall's approach to Fourth Amendment "seizure" analysis remains applicable to article I, section 7 "seizure" analysis.

"Examples of circumstance that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."

Young, 135 Wn.2d at 512 (alteration in original) (quoting Mendenhall, 446 U.S. at 554-55). Our Supreme Court continues to apply the Mendenhall formulation to state constitutional seizure analysis, see, e.g., Harrington, 167 Wn.2d at 664; State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004); O'Neill, 148 Wn.2d at 574, as does this court. See, e.g., State v. Mote, 129 Wn. App. 276, 282-83, 120 P.3d 596 (2005).

## B

Butler first contends that the trial court erred by denying his motion to suppress because his encounters with the police constituted one coordinated action and he was unlawfully seized by Officer Allen when he was commanded to stop leaving the scene near the traffic stop of the truck. This contention has merit.

## 1

As an initial matter, we note that the case before us does not involve a seizure arising from officer safety concerns. State v. Flores, 186 Wn.2d 506, 379 P.3d 104 (2016), is instructive.

In that case, our Supreme Court addressed whether police officers "making a lawful arrest may seize a companion of the arrestee in the absence of

reasonable suspicion to independently justify a Terry stop of the companion." Flores, 186 Wn.2d at 509 (footnote omitted). At the suppression hearing therein, the law enforcement officers testified that they had seized Flores because, even though they did not suspect Flores of criminal activity, "they were concerned that Flores posed a threat to their safety because of 'his association and close proximity to Powell within a few minutes of a report of Powell pointing a gun at someone's head.'" Flores, 186 Wn.2d at 510.

The Supreme Court began its analysis by discussing two of its decisions wherein individuals had been seized due to officer safety concerns, State v. Mendez, 137 Wn.2d 208, 970 P.2d 722 (1999), and State v. Parker, 139 Wn.2d 486, 987 P.2d 73 (1999). See Flores, 186 Wn.2d at 519-20. Notwithstanding that the decisions involved passengers in stopped vehicles, rather than pedestrians, the Flores court reasoned that,

> the court in Mendez and Parker was not concerned with the mobility of the vehicle, but with the threat that companions in the vehicle—those who are close in proximity to the subject of the stop—pose to officers. In Mendez, we described our test as "predicated specifically on safety concerns," 137 Wn.2d at 220, and in Parker we noted that "the search incident to arrest exception functions primarily to achieve [officer safety]," 139 Wn.2d at 499. Because the analysis in Mendez and Parker centered on safety concerns rather than the location of the stop, it should not be restricted to traffic stops, but is equally applicable in cases like this one where an arrestee is accompanied by companions at the time of the arrest.
>     This conclusion is common sense, as the potential danger at an arrest scene does not turn on whether people are sitting together in a car or walking side by side on a sidewalk.

Flores, 186 Wn.2d at 519. The court thus held that "where officers have an objective rationale predicated on safety concerns to seize a companion to secure

the scene of the arrest, article I, section 7 of the Washington State Constitution allows for the seizure, so long as it remains reasonable in scope and duration." Flores, 186 Wn.2d at 509.[2] The "objective rationale" must be predicated "specifically" on safety concerns, Flores, 186 Wn.2d at 527, not on the officer's desire to investigate. Id. at 523.

Here, the State did not argue its case against Butler as one involving officer safety concerns. Indeed, no police testimony reflected concern for officer safety during the officers' various exchanges with Butler. More to the point, the trial court's factual findings are devoid of any indication that officer safety was at issue.

Accordingly, this is not an officer safety case and Flores does not apply.

2

The question to resolve is whether Butler was unlawfully seized by Officer Allen when he was commanded to stop near the scene of the traffic stop of the truck in which he was not a passenger. We answer in the affirmative.

As a preliminary matter, when Butler left the vehicle in which he was a passenger, he was constitutionally indistinguishable from a pedestrian. O'Neill, 148 Wn.2d at 579; State v. Knox, 86 Wn. App. 831, 840, 939 P.2d 710 (1997), overruled on other grounds by O'Neill. The record reflects that the passenger vehicle had voluntarily pulled over to the side of the road ahead of the truck that had been directed to pull over by Officer Allen. Officer Allen did not intend to

_____

[2] On the other hand, when "the stop is for investigative purposes, we require officers to meet the Terry standard of individualized, reasonable, articulable suspicion." Flores, 186 Wn.2d at 520.

cause the passenger vehicle to pull over to the side of the road when he initiated his traffic stop of the truck, and he had no factual basis to justify doing so if he had so intended. Therefore, the vehicle from which Butler emerged was functionally equivalent to a car lawfully parked on the side of the road. It was not, at the time it came to rest, subject to Officer Allen's control. Consequently, when Butler left the vehicle, he did so as a pedestrian.

The parties do not dispute—and the trial court herein found—that Butler was seized by Officer Allen when Officer Allen commanded him to stop. Indeed, when Officer Allen commanded Butler to stop leaving the scene, Officer Allen's actions constituted "the use of language or tone of voice indicating that compliance . . . might be compelled." Mendenhall, 446 U.S. at 554; Young, 135 Wn.2d at 512. A reasonable, innocent person would not feel free to leave the scene or disregard Officer Allen's command. Accordingly, Butler was seized by Officer Allen.

3

We next turn to whether Officer Allen had sufficient grounds to justify a Terry stop of Butler. We conclude that he did not.

Absent officer safety concerns, article I, section 7 precludes police from asking vehicle passengers to remain at the scene of a vehicle stop, unless the requirements of a Terry stop are met. Mendez, 137 Wn.2d at 220-22. The police seize such a passenger when, after the passenger leaves the vehicle and begins to walk away, the police order the passenger to remain. Mendez, 137 Wn.2d at 222-23.

To justify a Terry stop under the Fourth Amendment and article I, section 7, a police officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); State v. Armenta, 134 Wn.2d 1, 20, 948 P.2d 1280 (1997). The level of articulable suspicion necessary to support an investigative detention is "a substantial possibility that criminal conduct has occurred or is about to occur." State v. Kennedy, 107 Wn.2d 1, 6, 726 P.2d 445 (1986).

Mendez, 137 Wn.2d at 223.

"[F]light alone may not be enough to justify a Terry stop." Mendez, 137 Wn.2d at 224.

Although "[f]light is an element of probable cause," State v. Baxter, 68 Wn.2d 416, 421-22, 413 P.2d 638 (1966), "a suspect's leaving at the time that a police cruiser arrives does not necessarily lead to the conclusion that it is reasonable to suspect that person of a crime." State v. Larson, 93 Wn.2d 638, 645, 611 P.2d 771 (1980). See State v. Thompson, 93 Wn.2d 838, 841, 613 P.2d 525 (1980) (hurried walking away without even looking back not enough to create reasonable suspicion of criminal conduct); State v. Walker, 66 Wn. App. 622, 629, 834 P.2d 41 (1992) ("flight alone" not enough to justify Terry stop).

Mendez, 137 Wn.2d at 224 n.6.

As indicated, Officer Allen testified that he had issued his command to Butler in reliance on his observation that Butler was leaving the scene near to where he had initiated a traffic stop on the truck.

But Officer Allen did not testify to any additional facts to justify his command to Butler. He acknowledged that he did not recognize Butler. He also knew that Butler had been a passenger, rather than the driver, of the vehicle from which he had emerged. He had no reason to believe that Butler, as a passenger,

- 12 -

had engaged in or was about to engage in any criminal activity. Therefore, Officer Allen lacked a lawful basis to seize Butler.

The trial court correctly ruled that Butler was unlawfully seized by Officer Allen.

C

The next question is whether Butler remained unlawfully seized during the period of time from his seizure by Officer Allen to his encounter with Officer Oates. This requires us to analyze whether Butler's encounters with Officers Allen and Oates were a part of a single investigative transaction or were two separate transactions.

For this inquiry we are mindful that, when an individual has been unlawfully seized, "[n]o subsequent events or circumstances can retroactively justify [the] stop." State v. Z.U.E., 178 Wn. App. 769, 780, 315 P.3d 1158 (2014) (citing Mendez, 137 Wn.2d at 224), aff'd, 183 Wn.2d 610, 352 P.3d 796 (2015).[3]

During the suppression hearing, Officer Allen and Officer Oates testified to their efforts in attempting to apprehend Butler. Officer Allen testified:

> Q. Did you have any other contact with the male passenger?
> A. Mr. Butler or --
> Q. Mr. Butler.
> A. Yes.
> Q. And when was that?
> A. During the investigation of the hit-and-run, as I was getting more investigation I saw him walking out of the woods, probably about a half a block down. I saw him look toward us

---

[3] Accord Rios v. United States, 364 U.S. 253, 261-62, 80 S. Ct. 1431, 4 L. Ed. 2d 1688 (1960) ("If, therefore, the arrest occurred when the officers took their positions at the doors of the taxicab, then nothing that happened thereafter could make that arrest lawful, or justify a search as its incident."); Henry v. United States, 361 U.S. 98, 103, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959) ("The fact that afterwards contraband was discovered is not enough. An arrest is not justified by what the subsequent search discloses.").

and just casually walk across the street. I broadcast over the radio that he was walking out of the woods, *and Officer Oates and Officer Farley went and contacted him for me.*

(Emphasis added.)

Officer Oates testified:

Q.   And do you recall an incident involving Mr. Kenneth Butler?
A.   Yes, sir.
Q.   And what was your first -- any information related to that call?
A.   *I heard that there was some type of a hit-and-run collision, which is something that I typically wouldn't respond to myself, but I heard officer -- or somebody put on the radio that some subjects fled and one of them had a warrant.*
Q.   And so what did you do in that situation?
A.   *Well, then I started to put myself en route, to go to potentially do a dog deployment.*
Q.   And when you arrived near the scene, what did you see?
A.   Officer Allen was dealing with the collision, and he just said, hey, the one suspect with the warrant fled into the woods, which was fairly close by the fire department. And so *we* didn't have any type of containment so *we thought*, well, *we'll just instead of deploying the dog* -- I didn't have anybody to run with me, *so instead of deploying the dog we thought we'd just drive around looking for the suspect.*
. . . .
Q.   And at this time, did you have a description at all of the person you were looking for?
A.   *We* just knew it was a white male and he was wearing a gray jacket and I think there was, like -- had a red stripe.
Q.   Did you eventually observe somebody matching that description?
A.   Yeah. As we were just driving around I noticed -- in one of the neighborhoods just south of the collision I noticed the subject walking up to a house, wearing a gray jacket.

(Emphasis added.)[4]

---

[4] Officer Farley, another officer involved in Butler's apprehension, testified:
Q.   *And what was your first involvement or information that you heard about that call or that case?*
A.   *I heard Officer Allen, I believe, call out with a suspicious complaint. I don't think he understood quite what was going on yet. It was up north,*

The testimony supports that the actions taken by Officer Oates were part of a coordinated police action in response to Officer Allen's desire to apprehend Butler. This supports that the encounter between Butler and law enforcement was a single investigative transaction. If the officers' actions formed a single transaction, Butler remained unlawfully seized and, "[o]bviously, once an individual is 'seized,' no subsequent events or circumstances can retroactively justify the 'seizure.'" Mendez, 137 Wn.2d at 224 (quoting State v. Stinnett, 104 Nev. 398, 760 P.2d 124, 126 (1988)). Thus, viewing the circumstances as one single event, it is plain that Butler was unlawfully seized and his motion to suppress should have been granted.

### D

However, the trial court concluded that Officer Allen's and Officer Oates's contact with Butler were two separate encounters. This was so, the trial court surmised, because, when Butler disregarded Officer Allen's command to stop and was not pursued by Allen, Butler's unlawful seizure ended. Therefore, the trial court concluded, Butler was not still unlawfully seized at the time that Officer Oates first contacted him.

---

like, around 108th, I believe, and Schultes Road. *He at that time said -- you know, I don't remember his exact words, but somebody had fled from a vehicle. I started floating up that way.* I was down south. I heard him say that a male had fled. He gave a description, and then I believe he put out that he was told or thought that the male had warrants for his arrest.

Q. Do you know how Officer Allen acquired that information?
A. I do not.
Q. Okay. Did you know any information about what had led up to the incident leading up to this call about a male fleeing?
A. No, I did not.

(Emphasis added.)

- 15 -

In support of its ruling, the trial court relied on Justice Fairhurst's concurrence in Rankin. Therein, Justice Fairhurst stated, in pertinent part:

> If a passenger leaves the car and the location, the seizure ends. If the passenger stays, the seizure continues. If the reasonable passenger would not feel free to leave when asked for identification, he has effectively been seized, even if he was not seized at the time the vehicle was stopped. If the passenger were to leave the vehicle, the seizure would end, but if the officer asks the passenger to return to the car, the passenger is again seized.

Rankin, 151 Wn.2d at 703 (Fairhurst, J., concurring). Significantly, no other justice joined in this concurrence and the majority opinion in Rankin did not address the analysis.

The analysis set forth in Justice Fairhurst's concurrence aligns with a Fourth Amendment seizure principle announced by the United States Supreme Court in Hodari D., 499 U.S. 621. In Hodari D., the Court held that a subject is not seized when the subject does not submit to an officer's show of authority. 499 U.S. at 626-28.

In Young, however, our Supreme Court rejected the application of the "subjective" Hodari D. test to seizure analysis under article I, section 7. The Washington Constitution, the Young court announced, requires application of a purely objective standard, 135 Wn.2d at 509-11, focusing not on whether the suspect subjectively perceived that he or she was being ordered to restrict his or her movements but, rather, on whether the officer's words and actions would have conveyed that meaning to a reasonable person. 135 Wn.2d at 506.[5]

---

[5] "The 'purely objective' standard articulated in Young rejected the Fourth Amendment seizure test, which contains a subjective element. See California v. Hodari D., 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)." Harrington, 167 Wn.2d at 663 n.3.

- 16 -

Our Supreme Court's rejection in <u>Young</u> of the "subjective" <u>Hodari D.</u> test is at odds with the rationale underlying Justice Fairhurst's concurrence in <u>Rankin</u>. Indeed, a seizure analysis focusing on whether the subject actually submitted to the police show of authority is an inquiry into the subjective mindset of the subject, an approach seemingly foreclosed by <u>Young</u>.

Nevertheless, it is so that the trial court herein relied on Justice Fairhurst's <u>Rankin</u> concurrence to conclude that Butler's seizure had ended when he "was not pursued and was no longer in the presence of any member of law enforcement." It is also so that our Supreme Court has yet to explicitly announce when an unlawful seizure ends for the purpose of article I, section 7 seizure analysis.

Thus, it is prudent for us to also analyze Officer Oates's interaction with Butler as if Butler's initial seizure by Officer Allen had ended prior to Officer Oates's contact with him.

E

Foreseeing this necessity in his appellate briefing, Butler contends that, even if his encounters with the police constituted two separate contacts, the trial court erred by denying his suppression motion because he was also unlawfully seized by Officer Oates. This contention has merit.

1

We must first determine whether (and when) Officer Oates's actions constituted a seizure.

Again,

> "Under article I, section 7, a person is seized " 'only when, by means of physical force or a show of authority,' " his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances, State v. Young, 135 Wn.2d 498, 510, 957 P.2d 681 (1998) (quoting State v. Stroud, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) and citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)), or (2) free to otherwise decline an officer's request and terminate the encounter, see Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); [State v.] Thorn, 129 Wn.2d [347,] 352[, 917 P.2d 108 (1996), overruled on other grounds by State v. O'Neill, 148 Wn.2d at 571]. The standard is . . . "a purely *objective* one, looking to the actions of the law enforcement officer." Young, 135 Wn.2d at 501 (emphasis added).

O'Neill, 148 Wn.2d at 574. "The 'reasonable person' test presupposes an *innocent* person." Bostick, 501 U.S. at 438.[6]

In determining whether Butler was seized by Officer Oates, we must consider whether, in the totality of the circumstances, a reasonable, innocent person would have felt free to leave the scene or otherwise decline Officer Oates's directive to come and talk with him. The "totality of the circumstances" approach mandated by case law requires that we view the situation in light of the circumstances of Butler's minutes-old encounter with Officer Allen. These circumstances were unquestionably part of the totality of the circumstances on the minds of both Butler and Officer Oates at the time they first became aware of one another's presence.

Taken in its totality, the circumstances herein would cause a reasonable, innocent person to believe that ignoring the officer's words or leaving the scene

---

[6] "This 'reasonable person' standard . . . ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." Bostick, 501 U.S. at 438 (quoting Michigan v. Chesternut, 486 U.S. 567, 574, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)).

of the encounter were not viable options. A reasonable, innocent person in Butler's position would know that he had—only minutes before—acted in lawful disregard of an officer's unlawful command to stop. The appearance of Officer Oates and the tracking dog would not appear to be a mere coincidence to a reasonable, innocent person. Instead, an objective viewer would conclude that the disregard of the first officer's command had led directly to the appearance of the second officer and the tracking dog. The officer's action in stepping from his vehicle and his verbalization of the words, "[H]ey, come talk to me, buddy," would not—objectively viewed—appear to be idle social prattle.[7]

To the contrary, under the prevailing circumstances, a reasonable, innocent person would believe that his confrontation with the police was escalating and that standing on his rights again might bear injurious consequences. Indeed, a reasonable, innocent person would be aware that tracking dogs are trained to pursue people who ignore police commands to stop and that such a police dog has the very real capacity to cause such a person physical harm.

In light of Butler's earlier encounter with law enforcement and the circumstances unfolding before him, a reasonable, innocent person would feel as if he were being pursued in response to ignoring Officer Allen's earlier command to stop. A reasonable, innocent person would recall Officer Allen visibly tracking his movements even after he walked away, would know that police officers have

---

[7] The trial court found that Officer Oates was in his patrol car at the time that he yelled out to Butler. This finding is not supported by the record. During the suppression hearing, Officer Oates testified that "I got out of my vehicle" in response to a prosecutor's question regarding how he made contact with Butler.

the ability to communicate with one another other via radio, and would conclude that it was no coincidence that he was approached by another officer while he was on the porch of a nearby house, minutes after he had disregarded the first police officer's command.[8]  Indeed, at that point, a reasonable, innocent person would deduce that the officer was specifically searching for him.

At that moment, a reasonable, innocent person would not feel free to leave or to disregard the officer's directive.  Accordingly, Butler was, at that time, seized by Officer Oates.[9]

2

The next question is whether Officer Oates's seizure of Butler was lawful.  The State contends that Officer Oates had a lawful basis on which to detain Butler because, pursuant to the fellow officer rule, Officer Oates could benefit from information obtained by Officer Allen to justify the later investigative detention of Butler.  The State is mistaken.

The fellow officer rule

> "provides that an arresting officer who does not personally possess sufficient information to constitute probable cause may still make a warrantless arrest if (1) he acts upon the direction or as a result of a communication from a fellow officer, and (2) the police, as a whole, possess sufficient information to constitute probable cause."

---

[8] The ownership of the home at issue is not established in the record.

[9] The trial court found that Officer Oates's interaction with Butler amounted to a social contact, rather than an investigative detention. We disagree. A social contact rests "someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention (i.e., Terry stop)." Harrington, 167 Wn.2d at 664 (citing Terry, 392 U.S. 1). "The term 'social contact' does not suggest an investigative component." Harrington, 167 Wn.2d at 664.

Here, Officer Oates had been alerted to Butler's description and possible outstanding arrest warrant.  Indeed, Officer Oates was searching for Butler.  The purpose of Officer Oates's interaction with Butler was not to greet a stranger on the street but, rather, was to detain a suspect as part of an ongoing police investigation.  This was not a social contact.

State v. Maesse, 29 Wn. App. 642, 646-47, 629 P.2d 1349 (1981) (quoting People v. Baca, 600 P.2d 770, 771 (1979)). We have previously analyzed the fellow officer rule in determining the propriety of a Terry stop. See, e.g., State v. O'Cain, 108 Wn. App. 542, 548-51, 31 P.3d 733 (2001).[10]

Here, the State relies on the fellow officer rule to justify Officer Oates's reliance on Officer Allen's knowledge of Butler's actions in order to justify Officer Oates's seizure of Butler. Yet, at the same time, the State argues that Butler's interactions with Officers Allen and Oates constituted two separate police encounters. The State's arguments are irreconcilable.

The fellow officer rule allows for the use of "the information possessed by the police as a whole *when they are acting in concert.*" Maesse, 29 Wn. App. at 647 (emphasis added). Thus, to accept the State's invocation of the fellow officer rule, we must conclude that the officers in question were acting in concert. But, if they were acting in concert, their interaction with Butler could not, of course, constitute two *independent* police contacts.

Conversely, if Officers Allen and Oates were acting independently of each other, then they were not acting in concert and the fellow officer rule does not apply. Accordingly, the trial court's ruling that these were two separate encounters forecloses resort to the fellow officer rule.

Thus, in the "two separate encounters" scenario, Officer Oates's decision to seize Butler must be justified by information premised solely on his own first-

---

[10] "The United States Supreme Court applied these same principles to a Terry stop in United States v. Hensley, 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)." O'Cain, 108 Wn. App. at 551.

hand knowledge. The State is thus left to defend Officer Oates's seizure of Butler by citing information acquired solely by Officer Oates's own observations.

Officer Oates's first-hand knowledge of Butler at the time of the seizure was as follows: a person unknown to him in a jacket was standing on the porch of a home about to knock on an entry door.

Nothing of which Officer Oates had first-hand knowledge justified a belief that Butler had engaged in or was about to engage in criminality. Officer Oates did not have a lawful basis to seize Butler.

3

And why not one final nail in the State's analytical coffin? Even if Officer Oates *was* afforded the benefit of the fellow officer rule, the information given to him by Officer Allen was insufficient to justify Butler's seizure.

Officer Allen learned of a possible warrant for Butler's arrest from the driver of the vehicle in which Butler had been a passenger. However, Officer Allen acknowledged at the suppression hearing that the information regarding Butler's outstanding arrest warrant was speculative.

> Q. When you spoke to the driver of the passenger vehicle, he told you that he didn't really know the passengers in his vehicle; is that correct?
> A. Correct.
> Q. That he had just met them; correct?
> A. Correct.
> Q. And he only knew the male as going by John; is that correct?
> A. Yes.
> Q. *So in terms of any information that the driver of the passenger vehicle would have about warrants, he's just purely speculating?*
> A. *Yes.*

(Emphasis added.)

An investigative detention is permissible only when the officer "has a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." State v. Acrey, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). Such a detention cannot be predicated upon speculation or "mere hunches." State v. Doughty, 170 Wn.2d 57, 63, 239 P.3d 573 (2010); accord Larson, 93 Wn.2d at 643; see also State v. Fuentes, 183 Wn.2d 149, 161, 352 P.3d 152 (2015) ("An officer's hunch does not justify a stop."); State v. Gatewood, 163 Wn.2d 534, 542, 182 P.3d 426 (2008) ("Officers seized Gatewood to conduct a speculative criminal investigation. Our constitution protects against such warrantless seizures and requires more for a Terry stop.").

Officer Allen testified that he knew that the information he had received from the car's driver was nothing more than speculation. In other words, it was a hunch. If it was nothing more than speculation when Officer Allen heard it, then it was nothing more than speculation when he repeated it into the police radio. Thus, it was nothing more than speculation when Officer Oates heard it on the radio. And it remained nothing more than speculation when Officer Oates acted upon it by seizing Butler. For this reason also, the seizure was unlawful.

III

Regardless of whether Butler's encounters with the police constituted one transaction or two separate contacts, Butler was unlawfully seized. Under either analysis, his suppression motion should have been granted. Accordingly, we

reverse both the trial court's order denying the suppression motion and the judgment of guilt entered against Butler.[11]

Reversed.

We concur:

---

[11] Given our resolution of this matter, we need not address Butler's remaining contentions.