[No. 46327-6-I.   Division One.   September 24, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES M. O'CAIN, *Appellant*.

---

[12] *See* RCW 9.94A.400(1)(a).

[13] *See* RCW 9.94A.390(i), .400(1)(a).

544

*Shannon B. Marsh* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Daniel J. Clark, Deputy*, for respondent.

KENNEDY, J. — When evidence is uncovered during a warrantless seizure based on a police dispatch that a particular vehicle has been reported stolen, the admissibility of the evidence turns on whether the State can prove at a subsequent suppression hearing that the police dispatch was based on a sufficient factual foundation to support the kind of seizure at issue—probable cause in the event of an arrest, or well-founded suspicion based on articulable facts in the event of an investigative stop. Officers who act on the basis of the dispatch are not required to have personal knowledge of the factual foundation, and are not expected to cross-examine the dispatcher about the foundation for the transmitted information before acting on it. Rather, the collective knowledge of law enforcement agencies giving rise to the police dispatch will be imputed to the officers who

act on it. If the resulting seizure is later challenged in court, the State cannot simply rely on the fact that there was such a dispatch, but must prove that the dispatch was based on a sufficient factual foundation to justify the stop at issue.

Here, the State presented no testimony regarding the source for the dispatch, relying instead on the primary investigating officer's postseizure verification that the vehicle had in fact been stolen from a rental car agency at SeaTac Airport, and that the appellant James O'Cain did not have the owner's permission to drive the vehicle. Although it is counterintuitive that a trial court cannot infer from this postseizure verification that the source for the dispatch was reliable, the Fourth Amendment is not so easily satisfied.[1] The question is not whether the vehicle was actually stolen, but whether police collectively had sufficient information at the time of the seizure to justify the stop. Because the record in this case contains no evidence from which the underlying reliability of the police dispatch can be assessed, and because police had no other lawful basis for the stop in this case, we reverse the trial court's suppression ruling and vacate O'Cain's judgment and sentence for unlawful possession of a firearm in the first degree.

## FACTS

At approximately 3:30 P.M. on October 12, 1999, King County Sheriff's Detective Lurry was stopped at a traffic light on Pacific Highway South near its intersection with South 200th Street. Detective Lurry was in plain clothes and driving an unmarked police vehicle. As he waited for

---

[1] O'Cain challenges the validity of the seizure under both the federal and state constitutions. Although our state Supreme Court has held that the first, second, third, fifth and sixth *Gunwall* criteria all lead to the conclusion that article I, section 7 provides greater protection to privacy than the Fourth Amendment, O'Cain has failed to adequately brief the fourth factor—preexisting state law—as it relates to the issues in this case. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986); *State v. Young*, 135 Wn.2d 498, 509, 957 P.2d 681 (1998); *State v. Mendez*, 137 Wn.2d 208, 217, 970 P.2d 722 (1999). Accordingly, we decide this case solely on Fourth Amendment grounds.

the light to change, he noticed an Isuzu Trooper parked next to another car in a 7-Eleven parking lot. Two subjects who appeared to be associated with the other car were standing on each side of the Trooper, conversing with the occupants. Lurry noticed that none of the individuals appeared to be in the parking lot for the purpose of shopping at the 7-Eleven Store.

Lurry has extensive experience in narcotics investigations, including 500 investigations involving crack cocaine, 40 to 50 buy/busts, and 15 to 20 cases as an undercover buy officer. Lurry was assigned to the "Pro-Act" team that conducts narcotics and vice enforcement. The area in question is one in which numerous narcotic transactions have occurred and where Lurry had been a participant in undercover buy/bust operations twice in the past. Although Lurry suspected, based on what he saw in the parking lot in light of all these factors, that a narcotics transaction had taken place, he took no action except to run a license check on the Isuzu Trooper. When the traffic light changed, Lurry proceeded on his way.

After driving about three blocks, Lurry was informed by police dispatch that the Trooper had been reported stolen. Lurry turned around, and as he proceeded back toward the 7-Eleven parking lot he requested assistance from uniformed police in the area. Deputy Keller, who was in uniform and driving a marked police vehicle, was one of several officers who responded.

As Lurry saw the Trooper begin to back out of the parking spot, he ordered Deputy Keller to stop the Trooper. Keller blocked in the Trooper with his marked police vehicle, and activated his emergency lights. Several other marked police vehicles arrived simultaneously and surrounded the Trooper. Keller and the other officers got out of their vehicles with their guns drawn, and ordered the several occupants of the Trooper to put their hands in the air. Everyone complied except for the driver of the Trooper, who was later determined to be James O'Cain. O'Cain appeared to be reaching under the driver's seat with one or both

hands, and continued with this reaching motion for approximately 10 to 15 seconds despite repeated orders that he raise his hands. Keller yelled to the other officers that O'Cain would not show his hands. He then heard the sound of metal being dropped against metal, after which O'Cain complied with the orders to raise his hands.

The occupants of the Isuzu Trooper were ordered out of the vehicle. One of the deputies recovered a loaded Ruger Security Six .357 Magnum revolver from just under the driver's seat where O'Cain had been reaching. It was determined that O'Cain had a previous felony conviction and was prohibited from possessing a firearm. O'Cain was arrested and subsequently charged with and convicted of unlawful possession of a firearm in the first degree.

Detective Lurry followed up on the stolen vehicle report and subsequently testified at the suppression hearing that he confirmed that the Trooper had been stolen from a rental-car agency at SeaTac Airport, and that O'Cain was driving the vehicle without the owner's permission.[2]

O'Cain requested a CrR 3.6 hearing and moved to suppress the firearm, contending that it was obtained during an unlawful search and seizure. The court denied this motion. O'Cain appeals that ruling.

## DISCUSSION

■■ O'Cain does not assign error to any of the trial court's findings of fact on the CrR 3.6 hearing. Unchallenged findings of fact following a CrR 3.6 suppression

---

[2] The verbatim report contains the following exchange:

Q: Okay. Did you later determine where the vehicle was stolen?

A: Yes.

Q: And where was that?

A: A rental agency at SeaTac Airport.

Q: All right. And at least just for the purposes of this hearing, did you determine whether Defendant had permission to have that vehicle from that agency?

A: Yes, I did, and he did not.

Report of Proceedings at 88.

hearing are accepted as verities on appeal, and will not be reviewed by the appellate court. *State v. Hill*, 123 Wn.2d 641, 644-47, 870 P.2d 313 (1994). Accordingly, "our review in this case is limited to a de novo determination of whether the trial court derived proper conclusions of law from those [unchallenged] findings." *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997) (citing *Hill*, 123 Wn.2d at 647).

■ ■ O'Cain argues that the court erroneously denied his motion to suppress the firearm because the State failed to prove at the suppression hearing that the officers had a well-founded articulable suspicion to support a warrantless investigatory stop.[3]

"As a general rule, warrantless searches and seizures are per se unreasonable." *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). However, under the *Terry*[4] exception, police may conduct a warrantless investigatory stop of an individual where the officer has a well-founded suspicion of criminal activity based on specific and articulable facts. *State v. White*, 97 Wn.2d 92, 105, 640 P.2d 1061 (1982). Our Supreme Court has defined "articulable suspicion" as "a substantial possibility that criminal conduct has occurred or is about to occur." *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986) (citing 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2, at 65 (1978)).

---

[3] O'Cain also contends, for the first time on appeal, that the degree of force employed by the officers in making the stop converted what would otherwise have been an investigative stop into a warrantless arrest. Because O'Cain did not raise this issue below, the record is not sufficiently developed for us to address it—the State having had no reason to present testimony with respect to why police executed a full felony stop. In any event, O'Cain effectively concedes, and properly so, that if a *Terry* stop was justified in the first instance, the police properly seized the firearm based on O'Cain's gestures and the sound of metal on metal—giving rise to legitimate concerns for officer safety. It is the stop itself that O'Cain challenges, regardless of whether it is viewed as a mere investigative stop or as a full-blown arrest. *See* Appellant's Br. at 13 n.6. Accordingly, we will analyze the case under principles governing investigative stops, noting that the use of felony stop procedures with drawn guns does not per se turn an investigative stop into an arrest; rather, each case must be examined on its own merits. *State v. Belieu*, 112 Wn.2d 587, 598-600, 773 P.2d 46 (1989).

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

■■ The trial court concluded that the stop in this case was justified because Detective Lurry, based on both the police radio report that the Trooper was listed as stolen and what he observed in the parking lot in light of his extensive experience with narcotics enforcement, had a "reasonable and articulable suspicion . . . that a drug transaction may be taking place involving defendant who was driving a stolen vehicle." Clerk's Papers at 52-53. Although the State has attempted to persuade us otherwise, we disagree that what Detective Lurry observed in the parking lot was legally sufficient to give rise to a well-founded suspicion that a narcotics transaction had taken place. Detective Lurry saw two vehicles parked side by side in the middle of the day at a 7-Eleven store, and saw the occupants of one of the vehicles standing alongside the Trooper, conversing with its occupants. None of these people appeared to be headed into the 7-Eleven store. The officer saw no hand motions suggesting an exchange of product or money. Based on his extensive experience enforcing narcotics laws in this particular neighborhood, Detective Lurry certainly had a hunch that a narcotics transaction had taken place; but a hunch does not rise to the level of a reasonable, articulable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (anything less than an objectively reasonable basis for an investigative stop would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches).

To Detective Lurry's professional credit, he obviously understood the distinction between a hunch and articulable suspicion, for when the traffic light changed he proceeded on his way, taking no other action than to run a routine license check on the Trooper. The only reasonable conclusion that can be drawn from this evidence is that O'Cain was stopped solely on the basis of the police dispatch that the Isuzu Trooper had been reported stolen. Accordingly, this case turns on the constitutional principles that apply to stops made on that basis, and we reject the trial court's conclusion that Detective Lurry's observations and experi-

ence justified the stop based on a substantial possibility that a narcotics exchange had taken place or was about to take place.

■ In *State v. Mance*, 82 Wn. App. 539, 918 P.2d 527 (1996) police stopped the defendant Mance and arrested him because the vehicle he was driving was listed as stolen on the department's "hot sheet." In fact, the defendant had purchased the vehicle off a car lot, and the car dealer had reported it stolen based on a misunderstanding. Upon learning of his mistake, the dealer called police to cancel the report. No cancellation report was on file, however, when police arrested Mance two days later. Mance resisted the arrest and in the course of the ensuing struggle, spit out a large rock of cocaine. He was subsequently convicted of possession of cocaine and appealed, arguing that the trial court should have granted his motion to suppress the cocaine because the arrest was unlawful. The *Mance* court wrote:

> The "fellow officer" rule justifies an arrest on the basis of a police bulletin, such as a "hot sheet," if the police agency issuing the bulletin has sufficient information for probable cause. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971). The bulletin does not, however, insulate the arresting officer from problems with the sufficiency or reliability of the information known to the issuing police agency. If the issuing agency lacks probable cause, then the arresting officer will also lack probable cause. *Whiteley*, 401 U.S. at 568.

*Mance*, 82 Wn. App. at 542.

Although the car dealer's report of a stolen car was reasonably trustworthy because it was a report from a person who believed himself the victim of a crime, so that there would have been probable cause to arrest Mance if the dealer had not called to cancel the stolen vehicle report, police cannot rely on incorrect information when they are at fault in failing to correct their records. " '[I]f we impute to the arresting officer the collective knowledge of law enforcement agencies for the purpose of establishing probable

cause, we must also charge him with knowledge of information exonerating a suspect formerly wanted in connection with a crime.'" *Id.* at 543 (quoting *People v. Ramirez*, 34 Cal. 3d 541, 668 P.2d 761, 764-65, 194 Cal. Rptr. 454 (1983)).

The United States Supreme Court applied these same principles to a *Terry* stop in *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). There, police made an investigatory stop in reliance on a "wanted flyer" that had been received by teletype from a nearby town in a neighboring state. In the course of the stop, the defendant Hensley was found to be in possession of handguns. He was subsequently indicted, tried and convicted of being a convicted felon in possession of firearms, contrary to federal law. The Sixth Circuit Court of Appeals reversed Hensley's conviction, reasoning that because police who stopped Hensley were familiar only with the flyer and not with the specific information that led to its issuance, they lacked a reasonable suspicion sufficient to justify an investigative stop. The United States Supreme Court reinstated the conviction, stating:

> Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

*Id.* at 233 (citing *United States v. Robinson*, 536 F.2d 1298 (9th Cir. 1976)). As had the Ninth Circuit in *Robinson*, the high Court recognized that effective law enforcement cannot be conducted unless police officers can act on information transmitted by one police agency to another, and that officers, who often must act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information. Thus, an officer who acts in good-faith reliance upon the bulletin does not need to have personal knowledge of the evidence supplying good cause

for the stop, so long as the issuing agency has the necessary information to support the *Terry* stop. *Hensley*, 469 U.S. at 231 (citing *Robinson*, 536 F.2d at 1299-1300).

O'Cain fails to cite *Mance*, *Hensley* and *Robinson*, but points to this court's opinion in *State v. Sandholm*, 96 Wn. App. 846, 848, 980 P.2d 1292 (1999) wherein we said that "exclusive reliance on the [Washington Criminal Identification Center] WACIC stolen vehicle report would not have provided sufficient basis for the State to establish probable cause to arrest." In responding, the State misapprehends this statement to be a rejection of the fellow-officer rule that provides the underlying basis for the rulings in *Mance*, *Hensley* and *Robinson*. But the quoted statement is wholly consistent with the fellow-officer rule. The State was not required to utilize the fellow-officer rule to establish the factual basis for the stolen vehicle report in *Sandholm* because its reliability was established by other means, i.e., strong physical evidence that the vehicle had, in fact, been stolen. 96 Wn. App. at 848. As indicated in the previous paragraph of the opinion, if there had *not* been such evidence, the State would have been required to legitimize the arrest by showing that the police or police agency that caused the vehicle to be listed as stolen by WACIC had probable cause to arrest the person found driving it. *Id.*

Put another way, when the legality of a warrantless seizure based on a police dispatch that a particular vehicle has been reported stolen is challenged, the State cannot justify the seizure merely by showing that the officer making the stop did so because he or she received the dispatch—this is exactly what the *Sandholm* court meant when it said that "exclusive reliance on the WACIC stolen vehicle report would not have provided sufficient basis for the State to establish probable cause to arrest." *Id.*

This is not to say that police officers receiving the dispatch may not act on it without further inquiry. They certainly may do so; indeed, effective law enforcement may very well require that they do so. *Hensley*, 469 U.S. at 231-32. And if they act in good faith, they likely have a

defense to any civil suit arising from the seizure that may be brought against them personally. *Id.* at 232. But the good faith of the officers executing the seizure does not relieve the State of its burden to prove that there was a factual basis for the stop—probable cause in the event of an arrest, and reasonable suspicion in the event of a *Terry* stop.

As the State points out, the quoted language in *Sandholm* is dicta. But it is entirely consistent with *Hensley*, by which we are bound, and so we decline the State's invitation to disavow the language.

The crux of O'Cain's contention on appeal is that the State failed to present evidence that the stolen vehicle report in the instant case was trustworthy, and thus the trial court should have granted the motion to suppress. The State points to the testimony of Detective Lurry that he later followed up on the stolen vehicle report and learned that the Isuzu Trooper had been stolen from a car-rental agency at SeaTac Airport, and that O'Cain did not have the agency's permission to drive the vehicle, arguing that this verification proves that the police dispatch was based on accurate information. Although it may seem counterintuitive that the reliability of a stolen-vehicle report isn't established by an after-the-fact (postseizure) confirmation that the vehicle really was stolen, the United States Supreme Court rejected a very similar argument in *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000). There, an anonymous telephone caller reported to police in Miami-Dade County, Florida, that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Two officers were dispatched to the bus stop, and when they arrived, they saw three black males, one of whom was J.L., who was wearing a plaid shirt. Apart from the tip, there was no indication of illegal conduct by J.L. or the others. Police approached J.L., told him to put his hands up, and frisked him, seizing a gun from his pocket. Thus, the tip proved to be accurate.

J.L. was charged and convicted with carrying a concealed firearm without a license and possessing a firearm while

under the age of 18. He moved to suppress the gun, and the trial court granted his motion. The intermediate appellate court reversed the trial court. The Florida Supreme Court reversed the appellate court, and reinstated the trial court's ruling. *Id.* at 268-69.

Florida sought review, contending that the tip was reliable because its description of the suspect's visible attributes proved accurate. There really was a young black male wearing a plaid shirt at the bus stop. The high Court rejected this argument:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed. 1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).

*Id.* at 272. The Court also commented that the mere fact that a tip, if true, would describe illegal activity does not mean police can make a *Terry* stop without meeting the reliability requirement. *Id.* at 273 n.\*. Thus, the mere fact that an anonymous tip turns out to be accurate cannot justify a seizure. That J.L. was, in fact, unlawfully carrying a firearm was irrelevant to the question of whether there was a sufficient factual basis for the stop. Similarly, here, the fact that the Isuzu Trooper was, in fact, stolen is irrelevant to the constitutionality of the stop in this case.

In *J.L.* the anonymous tipster was just that—anonymous—and police had no clue to his or her identity and no means of measuring his or her basis of knowledge and thus reliability. Here, the record is silent as to the identity of the person who reported that the Isuzu Trooper had been stolen—and thus there is no means in the record from

which to measure the basis of knowledge and reliability of that person. By that same token, the silent record leaves no means of determining the collective knowledge of police giving rise to the dispatch, so that the fellow-officer rule, while alive and well in this state after *Sandholm*, cannot be applied.

Professor LaFave teaches that "when a conclusory allegation (e.g., that a named individual is a drug dealer) is obtained from some computerized compilation of information but no showing is made as to the basis of that allegation, it must be treated as if it were nothing more than an anonymous tip" 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.5(e), at 277 n.103 (1996) (citing *United States v. Ornelas-Ledesma*, 16 F.3d 714 (7th Cir. 1994)). Thus, the fact that the stolen-vehicle report in this case (probably) was based on information stored in a computer, be it at WACIC or at King County, cannot provide the missing link to the State's case.

Judge Posner, writing for the *Ornelas-Ledesma* court said this with respect to the Narcotic and Dangerous Drug Information System (NADDIS):

> It would be nice to *know* something about NADDIS. . . . We do not know how many names are in it currently, where exactly the names come from, whether any of the information inputted into the system is screened for reliability before being entered, whether anyone checks to make sure that errors are not made in inputting information, whether information is updated systematically, and (a closely related question) whether information discovered to be stale or inaccurate is removed from the system. Although a number of judicial opinions mention NADDIS in passing—obviously it is widely used in drug enforcement—we have found no considered judicial assessment of its reliability. . . .

16 F.3d at 717. We could easily say the same thing about the Washington Criminal Information System (WACIC)—indeed, we did say as much in *Sandholm*:

> [T]he burden is on the State to establish the reliability of the radio report when the validity of a warrantless search or

seizure is at issue. . . . But here, the record provides no evidence concerning the source of the stolen vehicle report or evidence regarding the procedures followed by WACIC in accepting and broadcasting the information.

96 Wn. App. at 848 (citing *Mance*, 82 Wn. App. at 544-45).

The State's burden to establish reliability of its dispatches regarding stolen automobiles is not particularly onerous, and there is more than one way that the burden can be satisfied. Presenting testimony regarding the procedures utilized by WACIC might be one way—assuming that such procedures are designed to enhance reliability and actually work that way most of the time. We also note that hearsay is admissible at a suppression hearing. *See State v. Jones*, 112 Wn.2d 488, 493, 772 P.2d 496 (1989) (a trial court is not bound by the Rules of Evidence when it determines questions concerning the admissibility of evidence (citing ER 104(a), ER 1101(c)(1), (c)(3))). Thus, the trial court in this case could have asked Detective Lurry appropriate questions in order to elicit the source of the information and the factual basis underlying the stolen-vehicle report—information we suspect that Detective Lurry could have provided, in light of his responses to the questions that were, in fact, asked—and information which likely would have shown the collective knowledge of police at the time of the stop. But that is not what happened in this case, and here, unlike *Sandholm*, there is no physical evidence or any other type of evidence in the record to corroborate the reliability of the dispatch.

Accordingly, in accord with the requirements of the Fourth Amendment, we reverse the trial court's suppression ruling, vacate O'Cain's judgment and sentence and remand to the trial court for such further proceedings as shall be consistent with this opinion.

AGID, C.J., and GROSSE, J., concur.