IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80578-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| AURORA LILLIAN ANDERSON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Aurora Anderson challenges her criminal impersonation conviction on the basis that the police officer who stopped her and asked her identity lacked reasonable suspicion to detain her. She also challenges her second degree assault conviction, arguing that the State presented insufficient evidence. Lastly, she argues the trial court erred in imposing Department of Corrections (DOC) supervision fees.

Because the police officer who detained Anderson did so based on a reliable report that the DOC had issued a warrant for her arrest, we conclude the officer had reasonable suspicion to detain her. We also conclude the State presented sufficient evidence to support the second degree assault conviction. We therefore affirm both convictions. We remand to the trial court to strike the DOC supervision fees.

Citations and pin cites are based on the Westlaw online version of the cited material.

## FACTS

On May 17, 2019, around 1 a.m., Everett Police Officer Jarred Snyder saw a white Honda Civic parked in the parking lot of an AM/PM gas station. He observed a female in the driver's seat of the car. She was later identified as the appellant, Aurora Anderson.

Officer Snyder conducted a computer records check of the license plate and discovered that a month earlier, a female named Aurora Anderson had been contacted in the car and arrested. He conducted a computer records check of the name Aurora Anderson and discovered a report of an active felony warrant issued by the DOC. He reviewed the most recent Department of Licensing photograph associated with Anderson's driver's license and believed the driver was more likely than not Aurora Anderson.

Officer Snyder approached Anderson's car and opened the driver's door. He told Anderson he believed she was Aurora Anderson and there was a felony warrant for her arrest. Anderson identified herself as Alyssa Anderson, Aurora's sister. Officer Snyder returned to his patrol car, located a more recent photograph of Aurora Anderson, and determined that it looked exactly the same as Anderson.

Officer Snyder returned to Anderson's car, opened her door again, and told her she was under arrest because he believed she was Aurora Anderson and she had a felony warrant for her arrest. Anderson remained adamant that she was Alyssa, not Aurora. He repeatedly told Anderson to get out of the car but she refused to do so.

Anderson then started the car, which had a manual transmission, and tried to put it into gear, but the car stalled and died.

At this point, Officer Snyder reached into the car with his right arm, reached behind Anderson's head and wrapped his arm around the right side of her face. Anderson restarted the car and again attempted to put it into gear. Officer Snyder reached his right arm underneath Anderson's right armpit and attempted to pull her out of the car. Anderson grabbed the gearshift with her right hand, pinning Officer Snyder's right arm between her right arm and body. Because Anderson was actively trying to shift the car into gear, Officer Snyder, fearing that he would be dragged by the car and injured, pulled out his stun gun.[1]

Seeing the stun gun, Anderson leaned back and put her hands up. But then the car in front of her, which had been blocking her in, pulled away. Anderson almost immediately began accelerating, driving away at close to 10 miles per hour with the officer's arm still pinned. Officer Snyder testified that the pillar behind the driver's seat impacted his upper right arm and the side skirt bottom of the car impacted his right shin and pulled him forward a few feet.

After the car started moving, Officer Snyder deployed his stun gun into Anderson's chest. Anderson's body moved forward and Officer Snyder pulled his arm out and separated from Anderson and the car. As soon as Officer Snyder pulled his arm out, Anderson fled, driving over a curb and small embankment. She was arrested on May 21, 2019.

The State charged Anderson with second degree assault and first degree criminal impersonation.

---

[1] The witnesses used the word "taser," but we refer to the device generically as a "stun gun." We intend the two terms to be interchangeable here.

Anderson moved to suppress her statements to Officer Snyder regarding her identity arguing the State failed to prove that the report of an active DOC warrant was reliable enough to give rise to reasonable suspicion to detain her. The trial court denied the motion to suppress.

The jury found Anderson guilty on both counts. At sentencing, the trial court found Anderson indigent and imposed only the mandatory victim penalty assessment. The written judgment and sentence, however, ordered Anderson to pay community custody supervision fees.

ANALYSIS

A.    Anderson's Assault Conviction

Anderson argues that the State failed to prove the second degree assault charge because it did not present sufficient evidence to demonstrate that Anderson intended to assault Officer Snyder with a deadly weapon. We disagree.

Due process of law requires that the State prove every element of a charged crime beyond a reasonable doubt in order to obtain a criminal conviction. State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). Sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn from that

evidence. <u>Id.</u> Circumstantial and direct evidence are equally reliable. <u>State v. Delmarter</u>, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

As charged here, a person is guilty of second degree assault if he or she "under circumstances not amounting to assault in the first degree . . . [a]ssaults another with a deadly weapon." RCW 9A.36.021(c). Assault is defined as "an intentional touching or striking of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking is offensive if the touching or striking would offend an ordinary person who is not unduly sensitive."

Where there is no direct evidence of the actor's intended objective or purpose, intent may be inferred from circumstantial evidence. <u>State v. Bea</u>, 162 Wn. App. 570, 579, 254 P.3d 948 (2011). A jury may infer criminal intent from a defendant's conduct where it is plainly indicated as a matter of logical probability. <u>Id</u>. This includes inferring or permissively presuming that a defendant intends the natural and probable consequences of his or her acts. <u>Id.</u>

Anderson first challenges the element of intent, arguing that her intent was solely to escape Officer Snyder. Indeed, the circumstantial evidence would indicate that her apparent intent was to free herself from Officer Snyder's grip and evade arrest. To this end, she chose to drive her car forward while Officer Snyder's arm was pinned inside. The fact that Officer Snyder would be touched or struck by the car when she shifted the car into gear and drove while his arm was trapped inside the car is plainly indicated as a matter of logical probability. The jury was permitted to infer that Anderson intended the natural and probable consequence of driving her car with Officer Snyder pinned at the side and thus intended to strike

Officer Snyder with the car to force him to release her from his grasp. Viewed in the light most favorable to the State, there was sufficient evidence for a reasonable jury to find intent.

Anderson also challenges the "deadly weapon" element of the offense, arguing that the car was not a deadly weapon. A deadly weapon means any device "which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). Anderson used the moving car to free herself from Officer Snyder's grasp while his arm was pinned inside the car. The jury could infer from the circumstantial evidence that the car was readily capable of causing death or substantial bodily harm to Officer Snyder. Again, viewed in the light most favorable to the State, there was sufficient evidence for a reasonable jury to find that the assault was committed with a "deadly weapon."

Anderson argues that "[i]ntent to assault may be inferred from operation of a motor vehicle only where the defendant steers the vehicle toward the alleged victim, or otherwise indicates a purpose to bring the alleged victim in contact with the vehicle," citing State v. Baker, 136 Wn. App. 878, 151 P.3d 237 (2007) and State v. Toscano, 166 Wn. App. 546, 271 P.3d 912 (2012). Both cases did involve defendants who drove their cars toward law enforcement officers. But neither case limits the inference of intent to commit an assault to only those situations where a defendant drives toward another person or tries to bring the car into contact with another person. Anderson fails to cite any legal authority imposing such a limitation, and we decline to create such a limitation.

Anderson also analogizes her case to State v. Melland, 9 Wn. App. 2d 786, 452 P.3d 562 (2019). In Melland, the defendant was charged with second degree assault based on "recklessly" inflicting "substantial bodily harm." Id. at 803. The victim did not testify and the only evidence describing the assault was a medical record which indicated the defendant "grabbed the phone from patient's hand which hurt her finger." Id. at 804-05. We held the evidence was sufficient to prove Melland fractured the victim's finger, but there was no evidence that Melland knew of or disregarded the risk that he would fracture her finger when he grabbed the phone from her hand, the standard for proving recklessness. Id.

Melland is not analogous. In this case, the victim of Anderson's assault, Officer Snyder, testified as to how Anderson assaulted him with her car and her repeated attempts to flee while his arm was pinned inside her car. This testimony allowed the jury to infer Anderson's intent. We are unpersuaded by the comparison to Melland.

Lastly, Anderson argues that no rational jury could conclude she had the requisite intent because Officer Snyder testified that he believed the use of the stun gun affected her ability to drive the car. Officer Snyder did state "I believe she didn't have much control over her actions probably due to the effect of the taser." But Officer Snyder also testified that Anderson put the car into gear and began driving away before he deployed his stun gun; he did not deploy the stun gun until after the car started moving. Because Anderson drove away with his arm pinned inside the car before he deployed his stun gun, a rational jury could infer that Anderson possessed the requisite intent before she lost physical control of her body movements.

- 7 -

Viewed in the light most favorable to the State, there was sufficient circumstantial evidence from which a jury could draw reasonable inferences, and the jury's verdict is supported by substantial evidence. We conclude that the State met its burden to prove that Anderson intentionally assaulted Officer Snyder with her car, using it as a deadly weapon.

B.    Anderson's Criminal Impersonation Conviction

Anderson argues her conviction for criminal impersonation must be reversed because Officer Snyder lacked reasonable suspicion to detain her. Without reasonable suspicion, she contends, her statements to Officer Snyder that she was Alyssa Anderson were inadmissible. We disagree because the trial court's findings support its conclusion that Officer Snyder had a reasonable and articulable suspicion to justify detaining Anderson.

After conducting a CrR 3.6 suppression hearing, the trial court found Officer Snyder ran Anderson's license plate number on his mobile data terminal and saw that a month earlier she had been contacted in that vehicle and arrested on a DOC warrant. He also discovered, when he ran Anderson's name, that she had an active warrant for her arrest. After reviewing Anderson's Department of Licensing photograph, he believed that the driver of the Honda was more likely than not the person named in the arrest warrant. Officer Snyder informed dispatch he intended to contact the vehicle, but he did not confirm the existence of the warrant through dispatch. When he approached the car and asked the driver her name, she identified herself by a different name. She then fled the scene and was not booked into custody that night.

From these facts, the trial court concluded the officer had a reasonable and articulable suspicion that the driver of the car was Aurora Anderson and that she had an active warrant for her arrest. It reasoned that there is no requirement that an officer must confirm the validity of a warrant when the existence of the warrant is presumptively reliable. The court cited Officer Snyder's testimony that he believed the warrant existed and deemed the report of the warrant to be reliable. It further determined that once the arrest warrant information became known to Officer Snyder, he had "an affirmative duty to effectuate an arrest [of] the person for whom the warrant has been issued." Finally, it concluded the State had proved by clear and convincing evidence that Anderson's detention and the inquiry into her name were part of a permissible Terry stop.

Anderson does not assign error to the trial court's findings of fact. We therefore accept the unchallenged findings of fact as verities on appeal. State v. O'Cain, 108 Wn. App. 542, 547-48, 31 P.3d 733 (2001). Our review is limited to a de novo determination of whether the trial court derived proper conclusions of law from those unchallenged findings. Id. at 548.

As a general rule, warrantless searches and seizures are per se unreasonable. O'Cain, 108 Wn. App. at 548. However, under the Terry[2] exception, police may conduct a warrantless investigatory stop of an individual where the officer has a reasonable suspicion of criminal activity based on specific and articulable facts. Id.

---

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968).

Anderson contends the trial court's findings are insufficient to support the conclusion that Officer Snyder's Terry stop was permissible and that under the "fellow officer" rule, the State had to prove the DOC—not Officer Snyder—had reasonable suspicion that a valid warrant existed.

Under the fellow officer rule, an arresting officer who does not personally possess sufficient information to constitute probable cause may make a warrantless arrest if (1) he acts on the direction or as the result of a communication from a fellow officer and (2) the police, as a whole, possess sufficient information to constitute probable cause. State v. Butler, 2 Wn. App. 2d 549, 570, 411 P.3d 393 (2018) (quoting State v. Maesse, 29 Wn. App. 642, 646-47, 629 P.2d 1349 (1981)). This rule, also known as the police team rule, allows a court to consider the cumulative knowledge of police officers in determining whether there was probable cause to arrest a suspect without first obtaining a judicial arrest warrant. State v. Ortega, 177 Wn.2d 116, 297 P.3d 57 (2013).

We have held that the fellow officer rule also applies to warrantless Terry stops. O'Cain, 108 Wn. App. at 550-51. In that case, a police officer conducted a Terry stop after reading a dispatch bulletin that the car in which O'Cain sat had been reported stolen. We held that "an officer who acts in good-faith reliance upon [a police bulletin reporting the theft of a vehicle] does not need to have personal knowledge of the evidence supplying good cause for the stop, so long as the issuing agency has the necessary information to support the Terry stop." Id. at 551-52. The State failed to prove the law enforcement agency that reported the vehicle stolen had a factual basis for the reported theft. This court held that when a defendant challenges the legality of a warrantless seizure based on a police

- 10 -

bulletin, the State may not justify the seizure merely by showing that the officer making the stop did so in good faith reliance on that bulletin. Id. at 552. Because the State failed to prove the police bulletin information was reliable, we concluded the Terry stop was unlawful. Id. at 556.

Anderson asks us to apply the same rule here. The State argues the fellow officer rule and the evidentiary requirements of O'Cain do not apply to a stop predicated on the existence of a DOC arrest warrant. We agree. First, unlike O'Cain, this was not a warrantless Terry stop. Officer Snyder stopped Anderson because he learned there was a warrant for her arrest. The fellow officer rule is confined to warrantless arrests or detentions and is thus inapplicable here.

Second, the report of an active warrant is unlike a police bulletin in which the facts of alleged criminal conduct are untested. The secretary of DOC is authorized by statute to issue a warrant for the arrest of any offender under its supervision who violates a condition of community custody. RCW 9.94A.716(1). That warrant may issue only if a community corrections officer first proves to the secretary that he or she has reasonable cause to believe a violation has occurred. RCW 9.94A.716(2). Under this statutory scheme, a DOC warrant is analogous to a judicially issued arrest warrant because the warrant does not issue based on a single officer's report that a crime has been committed but is tested by the secretary of that agency.

Anderson argues the State failed to establish that the warrant was in fact active on May 17 and the only warrant in the record bears a date of May 21, several days after Officer Snyder detained her. Had Snyder actually arrested Anderson on May 17, she could have challenged the legal validity of the arrest warrant. But

Anderson fled before she could be arrested. The standard here is whether Officer Snyder had a well-founded articulable suspicion to justify the stop. That a warrant may later be found defective does not render that suspicion unreasonable.

The evidence supports the trial court's conclusion that Officer Snyder acted reasonably in deeming reliable the reported DOC warrant. Officer Snyder testified that his search of computer records indicated an active felony warrant, that he believed his computer system was accurate, and that he routinely relied on this information to do his job. Under these circumstances, Officer Snyder had what he believed to be a reliable and accurate report of an active DOC arrest warrant which provided him with a reasonable and articulable suspicion for initiating a <u>Terry</u> stop.

Anderson contends we should treat DOC arrest warrants the same as we treat police bulletins and extend the fellow officer rule to this case because the DOC is a law enforcement agency and performs law enforcement functions. We do not find this argument persuasive because the fellow officer rule applies to <u>warrantless</u> arrests and detentions. Anderson presents the court with no authority to support extending the fellow officer rule to a case in which the officer initiated a <u>Terry</u> stop based on what the officer reasonably believed to be an accurate report of the existence of an arrest warrant.

We therefore affirm the trial court's conclusion that Officer Snyder had reasonable suspicion to detain Anderson and it did not err by admitting Anderson's statements to Officer Snyder.

C.    Department of Corrections Supervision Fees

Anderson argues that the trial court erred by ordering her to pay DOC supervision fees as a condition of community custody in its written judgment and sentence. We agree.

As a threshold matter, the State contends that we should not review this issue because it was not raised at the trial court. However, Anderson had no reason to object to the imposition of supervision fees because the court found her indigent and indicated that it would "only impose the mandatory $500 victim penalty assessment." There was no indication the court intended to impose supervision fees. Further, conditions of community custody may be challenged for the first time on appeal. State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). Anderson's failure to object to the supervision fees is understandable in light of the surrounding circumstances, and the record is sufficient for us to address the issue.

"Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the department". RCW 9.94A.703(2)(d). Supervision fees are discretionary legal financial obligations because they may be waived by the court. See State v Dillon, 12 Wn. App.2d 133, 152, 456 P.3d 1199 (2020). In Dillon, we struck the community custody supervision fee because the record demonstrated that the trial court intended to impose only mandatory legal financial obligations. Id. at 152.

Here, as in Dillon, the record demonstrates the trial court intended to impose only mandatory legal financial obligations. At sentencing, the trial court judge verbally went through the recommended indigency screening form with Anderson and found her indigent: "So I am persuaded that you are indigent and I will,

- 13 -

therefore, only impose the mandatory $500 victim penalty assessment. I will not impose the $200 filing fee." The trial court did not mention supervision fees. Under the section in the judgment and sentence on legal financial obligations, the trial court ordered Anderson to pay a $500 victim assessment fee. The trial court then listed the total legal financial obligations as $500. There is no option to order the payment of supervision fees in this legal financial obligations section. Under the section in the judgment and sentence on community custody conditions, the requirement that Anderson "pay supervision fees as determined by DOC" is buried in a lengthy boilerplate paragraph regarding conditions of community custody. See Dillon, 12 Wn. App.2d at 152. From this record, it appears that the trial court intended to waive all discretionary legal financial obligations, but inadvertently imposed supervision fees because of its location in the judgment and sentence. We remand to the trial court to correct this error.

We affirm Anderson's convictions for second degree assault and first degree criminal impersonation, and remand to the trial court to strike the DOC supervision fees.

_Andrus, A.C.J._

WE CONCUR:

_Bremmer, J._       _Smith, J._