# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, <br><br> Respondent, <br><br> v. <br><br> TIMOTHY PAUL HERNANDEZ, <br><br> Appellant. | DIVISION ONE <br><br> No. 80688-2-I <br><br> UNPUBLISHED OPINION |

DWYER, J. — Timothy Hernandez appeals his murder conviction. Hernandez challenges his warrantless arrest, arguing that officers lacked probable cause to arrest him. But the trial court's unchallenged findings demonstrate that the totality of the facts and circumstances within the officers' knowledge at the moment they arrested Hernandez was sufficient to cause a person of reasonable caution to believe he had murdered his girlfriend. And while the trial court erred by not engaging in an individualized inquiry into whether shackles were necessary prior to every court appearance, the State has established that the error was harmless beyond a reasonable doubt. Accordingly, we affirm.

I

The body of Hernandez's girlfriend, Vanessa Cons, was found decapitated, with her head placed on her lower back, in the bedroom they

shared. The State charged Hernandez with first degree murder, with a domestic violence allegation.

At a hearing on February 16, 2019, the State filed a written motion requesting that Hernandez be restrained when he appeared in the courtroom. The motion listed the following reasons for the restraint request: (1) "the nature of the offense: Defendant murdered and beheaded the victim because he believed God told him to"; (2) "defendant's record: prior DV [domestic violence], incest, multiple VNCOs [violation of no contact orders]; (3) "risk of escape: 15 prior cases with warrant activity"; (4) "threat of harm to others: see above- nature of offense." The motion also checked boilerplate language regarding facilities, describing general safety and escape concerns regarding the jail courtroom and the Kincaid Street courtroom.

In its oral ruling, the trial court explained the individualized factors that it considered:

> And, Mr. Hernandez, we're here simply to determine the issue of whether you come in with handcuffs into the courtroom in the future. And the factors that we look at include the type of crime charged, convictions for any sort of violent offenses in the past, threatening behavior, and a variety of other things. And I see that considering the charge that you're charged with, and the circumstances that are alleged, coupled with the alleged violation of protection order, not following court orders, you have prior protection order violations dating back. In the future, I'm going to require that you remain shackled when you come in for future court hearings.

The same day, the trial court issued a written order regarding courtroom restraints. The court found that "[c]ompelling circumstances exist that some measure is needed to maintain security of the courtroom by restraining the

2

defendant and available alternative measures are inadequate." The court thus ordered that "[d]efendant shall be restrained while in the courtroom, subject to an oral or written motion for reconsideration by the defendant."

On April 5, May 3, and May 9, 2019, the court convened hearings regarding Hernandez's request that the court order a competency evaluation, and then, after the evaluation came back finding Hernandez competent, the issue of the trial court signing an order finding Hernandez competent. On September 5, 2019, the court held a status conference. The issue of shackling was not revisited by either party or the court at any of these hearings.

On October 9, 2019, the court held a hearing regarding Hernandez's motion to suppress evidence, including his statements made to detectives at the police station after being arrested, on the basis that the police did not have probable cause to arrest him, pursuant to CrR 3.6, and whether his statements to the detectives were admissible pursuant to CrR 3.5. At the start of the hearing, Hernandez's attorney said, "Your Honor, . . . I guess our first request would be if we could have Mr. Hernandez be unshackled for his participation in this hearing." The prosecutor responded, "There's been a previous shackling order, it is on file with the Court." The court replied, "Okay. I'm going to ask . . . Sergeant Schrader to unshackle. Are you right-handed or left-handed, Mr. Hernandez?" Mr. Hernandez replied that he was right-handed, and the court authorized that Hernandez's right hand be unshackled.

Following the suppression hearing, the court entered a written order, entitled Findings of Fact and Conclusions of Law re: Motion to Suppress

3

Statements, concluding that Hernandez's warrantless arrest was lawful. The order contains 16 findings of fact.

The court held a stipulated bench trial on October 15, 2019. Hernandez's attorney again requested that Hernandez be unshackled: "I am requesting that my client be unshackled for purposes of our hearing or trial today so that he can meaningfully participate and take notes." The court responded, "Okay. And Mr. Hernandez is right-handed or left-handed?" Hernandez's attorney said he was right-handed, and the court said, "Okay. Given the prior order unshackling, I will authorize that his right hand be unshackled."

The court found Hernandez guilty of second degree murder and further found that the domestic violence allegation had been proved. The court concluded that Hernandez stabbed Cons on multiple occasions with a large butcher knife that was located in the kitchen sink; Hernandez did this killing with the intent to cause Cons's death, and Cons died as a result of Hernandez stabbing her. The court concluded that the homicide occurred within the bedroom shared by Hernandez and Cons. The trial court's written order, entitled Findings of Fact and Conclusions of Law on Stipulated Trial to the Court, included 25 findings of fact.

The court held a sentencing hearing on October 23, 2019. Hernandez's attorney asked the court to have Hernandez's right hand unshackled: "I am asking that the Court permit Mr. Hernandez to have his hand, excuse me his right hand unshackled so he can sign documents and participate in today's hearing."

The court asked the sergeant to release Hernandez's right hand.  The sentencing then took place.

Hernandez appeals.

II

Hernandez argues that the trial court erred by concluding that his warrantless arrest was lawful.  Hernandez contends that the police lacked probable cause to arrest him.  We disagree.

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, a warrantless arrest must be supported by probable cause.  State v. Bonds, 98 Wn.2d 1, 8-9, 653 P.2d 1024 (1982).  Probable cause is an objective standard used to measure the reasonableness of an arrest.  State v. Graham, 130 Wn.2d 711, 724, 927 P.2d 227 (1996). An officer has probable cause to arrest a person when the facts and circumstances within the arresting officer's knowledge are sufficient to cause a person of reasonable caution to believe a crime has been committed.  Graham, 130 Wn.2d at 724.  A determination of probable cause rests on "the totality of facts and circumstances within the officer's knowledge at the time of the arrest." State v. Fricks, 91 Wn.2d 391, 398, 588 P.2d 1328 (1979).  Probable cause requires more than "'a bare suspicion of criminal activity,'" but does not require facts that would establish guilt beyond a reasonable doubt.  State v. Gillenwater, 96 Wn. App. 667, 670, 980 P.2d 318 (1999) (quoting State v. Terrovona, 105 Wn.2d 632, 643, 716 P.2d 295 (1986)).  Whether probable cause

exists is a legal question that we review de novo. State v. Wagner-Bennett, 148 Wn. App. 538, 541, 200 P.3d 739 (2009).

Hernandez assigns no error to any of the trial court's findings of fact entered after his pretrial suppression motion. Unchallenged findings of fact are verities on appeal. State v. O'Cain, 108 Wn. App. 542, 547-48, 31 P.3d 733 (2001). Our review is limited to a de novo determination of whether the trial court derived proper conclusions of law from those unchallenged findings. O'Cain, 108 Wn. App. at 548. Those findings establish the following facts.

Hernandez and Cons were in a romantic relationship and had two children in common: L.H. (three years old) and A.H. (six years old). The four of them lived in the house of Hernandez's parents, Oscar and Rosalinda Hernandez. The four of them used a single bedroom in the house.

On August 26, 2018, at about 12:37 p.m., Oscar called 911 to report that Hernandez was possibly suicidal driving in the Burlington area. Oscar was driving in the Burlington area and believed he had just seen Hernandez driving in the area about seven minutes earlier. Oscar then indicated that he also needed law enforcement response to his house in Mount Vernon because "'there might be a murder that might've happened right there.'" He said he had spoken to Rosalinda on the telephone prior to calling 911 and Rosalinda said that "'Tim's girlfriend I think he might have . . . he might have killed her . . . [h]e might have done harm to her." At about five minutes into the 911 call, Oscar entered his house and saw Cons lying on the floor in the bedroom and that she had been beheaded.

Multiple officers responded to the house and discovered Cons's body on her stomach in the bedroom shared by her, Hernandez, and their children. Cons had been decapitated and her head placed on her lower back. The blood on Cons's face appeared to be somewhat dried and it therefore appeared that the incident happened sometime before 911 was called.

Oscar and Rosalinda indicated that Hernandez and L.H. were unaccounted for. The front door of the house did not display any evidence of forced entry. The door in the garage was locked from the inside. The master bedroom had a sliding glass door to the outside that was secured and locked from the inside. The shower was very wet and it appeared as though someone had recently taken a shower therein.

Oscar, Rosalinda, A.H., and another minor child who was present at the house at the time (S.H., a child of Oscar and Rosalinda's daughter), were transported to the police station.

Oscar's interview lasted from 1:40 p.m. to 2:01 p.m. Oscar described a history of Hernandez and Cons hitting and pushing each other; he said Hernandez was jealous and did not trust Cons. He said that on the prior night Cons and Hernandez had been arguing. Oscar said that morning he had left his house at 9:30 a.m. for church.

Rosalinda was interviewed by a different officer at about the same time Oscar was being interviewed. Rosalinda said she had gone to church with S.H. and A.H. about 10:00 that morning. She said that when they left for church Hernandez, Cons, and L.H. were the only people left at the house. They were

7

supposed to meet up at church later, but Hernandez and L.H. never arrived. Rosalinda said that she, S.H., and A.H. returned home at about 12:15 p.m. A.H. and S.H. went into the bedroom and discovered Cons decapitated on the floor. Rosalinda confirmed that Hernandez and Cons had argued the previous day, for about two hours.

While these interviews were occurring, other officers were out looking for Hernandez and his car. Eventually word was received that Hernandez's cell phone was "pinging" in the area of a nearby mall.

Officers went to the mall to look for Hernandez. When Hernandez and L.H. left the mall at 2:01 p.m., officers approached him and told him they needed to talk about what happened that morning and that he was going to be handcuffed. An officer handcuffed Hernandez and he was transported to the police station.

The trial court concluded that Hernandez was arrested as of the moment he was handcuffed; neither party challenges this conclusion on appeal. In sum, the totality of the facts and circumstances within the officers' knowledge at the moment they handcuffed Hernandez was sufficient to cause a person of reasonable caution to believe that he had murdered Cons.

In arguing that the police lacked probable cause to arrest him, Hernandez fails to address the trial court's extensive and unchallenged findings in support of the conclusion that the police had probable cause to arrest him, detailed at length above. He instead cites, somewhat oddly, to his own motion to suppress that he

submitted to the trial court: specifically, a list of what he believed the police knew at the time they arrested him. His argument is unpersuasive.

We affirm the trial court's conclusion that the police had probable cause to arrest Hernandez.

III

Hernandez argues that the trial court violated his right to appear before the court free of shackles.

We review the decision of whether to shackle a defendant for an abuse of discretion because the decision on whether to shackle is vested within the discretion of the trial court. State v. Jackson, 195 Wn.2d 841, 850, 467 P.3d 97 (2020). A trial court abuses its discretion when its decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons. Jackson, 195 Wn.2d at 850.

To ensure the right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution, it is well established that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances. Jackson, 195 Wn.2d at 852. In Jackson, the Washington Supreme Court determined that the constitutional right to a fair trial is also implicated by shackling and restraints at nonjury pretrial proceedings. 195 Wn.2d at 852.

But the right to be free from restraint is not absolute, and trial court judges are vested with the discretion to determine measures that implicate courtroom

security, including whether to restrain a defendant in some capacity in order to prevent injury. Jackson, 195 Wn.2d at 852. This discretion must be founded upon a factual basis set forth in the record. Jackson, 195 Wn.2d at 853.

The Washington Supreme Court has identified several factors for a trial court to address when determining if a defendant needs to be shackled:

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

Jackson, 195 Wn.2d at 853 (alteration in original) (quoting State v. Hutchinson, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998)).

In Jackson, our Supreme Court held that the trial court abused its discretion and committed constitutional error when it required Jackson to be shackled pursuant to a blanket jail policy at his pretrial proceedings without an individualized inquiry into its need. 195 Wn.2d at 855. The Supreme Court held that "[a] trial court *must* engage in an individualized inquiry into the use of restraints prior to every court appearance." Jackson, 195 Wn.2d at 854-55. The Supreme Court remanded the case for a new trial "with instructions that *at all stages of the proceedings*, the court shall make an individualized inquiry into whether shackles or restraints are necessary." Jackson, 195 Wn.2d at 858 (emphasis added).

Unlike in Jackson, here the trial court conducted an individualized inquiry when it made its initial determination regarding shackling on February 16, 2019. In its oral ruling, the trial court stated that it was considering "the charge that you're charged with, and the circumstances that are alleged, coupled with the alleged violation of protection order, not following court orders, you have prior protection order violations dating back. In the future, I'm going to require that you remain shackled when you come in for future court hearings."

At the next hearings, held in April, May, and September 2019, the record contains no indication that the shackling order was revisited by either party or by the court.

The shackling order was revisited at the three hearings in October 2019: the hearing regarding Hernandez's motion to suppress and whether his statements would be admitted; the stipulated bench trial; and the sentencing hearing. At each hearing, Hernandez's attorney requested that Hernandez be unshackled for the hearing, and the court considered the matter and authorized Hernandez's right hand to be unshackled.

Under Jackson,[1] the trial court erred by not revisiting the shackling issue at the hearings in April, May, and September 2019 because Jackson requires the trial court to engage in an individualized inquiry regarding whether shackles are necessary before every court appearance, or at all stages of the proceedings. Jackson, 195 Wn.2d at 854-55, 858.

---

[1] We note that the Washington Supreme Court issued Jackson in July 2020. This was after all of the trial proceedings at issue here had concluded.

The State argues that even if the trial court erred, the error was harmless. The State bears the burden to prove beyond a reasonable doubt that the constitutional violation was harmless. Jackson, 195 Wn.2d at 856. To establish harmless error the State must overcome the presumption of prejudice that arises when a constitutional right of the defendant is violated. To do this, the State must show, from an examination of the record, that it appears the error was harmless beyond a reasonable doubt. This may be demonstrated by showing that the evidence against the defendant is so overwhelming that no rational conclusion other than guilt could have been reached. Jackson, 195 Wn.2d at 855 (quoting State v. Clark, 143 Wn.2d 731, 775-76, 24 P.3d 1006 (2001).

As an initial matter, the court revisited the shackling issue before the hearings at which Hernandez's constitutional rights were most significantly at issue. Restraints are "'viewed with disfavor because they may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in one's own behalf, and right to consult with counsel during trial.'" Jackson, 195 Wn.2d at 852 (quoting State v. Hartzog, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)). These "important constitutional rights" were most implicated at the hearings regarding whether Hernandez's statements and other evidence would be admitted, the stipulated bench trial, and sentencing. In contrast, the hearings at which the issue of shackling was not revisited concerned: (1) Hernandez's request to have the court order a competency evaluation, which it did (April 5); (2) a defense request to the court not to sign an order finding Hernandez competent after the competency evaluation came back

finding him competent, where the court set the case out a week in order to allow Hernandez's attorney an opportunity to supplement the record (May 3); (3) entry of an order finding Hernandez competent after Hernandez's attorney stated he had nothing new to present to the court (May 9); and (4) conducting a status conference to discuss trial dates (September 5).

Most importantly, any error in the trial court's decisions regarding shackling was harmless beyond a reasonable doubt given that the evidence against Hernandez is so overwhelming that no rational conclusion other than guilt could be reached. After the stipulated bench trial, the trial court issued an order entitled Findings of Fact and Conclusions of Law on Stipulated Trial to the Court, which contains 25 findings of fact. Hernandez assigns no error to any of those findings. Unchallenged findings are verities on appeal. O'Cain, 108 Wn. App. at 547-48.

Many of those findings duplicated information from the findings entered after Hernandez's pretrial suppression motion concerning the time period leading up to Hernandez's arrest (detailed in our probable cause analysis above). Those findings also included additional evidence that was obtained after Hernandez was arrested. Those findings establish the following additional facts.

Investigators located a large butcher knife in the kitchen sink at the murder scene. The blade had been cleaned off, but the handle had blood and hair on it. The blood was later examined and found to contain the DNA of Cons and Hernandez. Also located at the scene was bloody clothing. The clothing was swabbed and found to contain the DNA of Cons and Hernandez.

13

L.H., in a police patrol vehicle en route to the police department, spontaneously stated, "My dad stabbed my mom." She repeated, "My dad stabbed my mom." In an interview at the police station, L.H. stated that she saw daddy cut mommy with scissors. She said she heard mommy scream during this. She said daddy then walked around a lot and told her she needed to go say goodbye to mom. She said she did not know why mommy had her eyes closed and blood on her face. This description matched what police officers observed of Cons's severed head.

When detectives interviewed Hernandez at the police station after he was arrested, he repeatedly referred to Bible verses. He said that Cons had mocked God and mocked him, and that he had struck down the beast. The following exchange took place:

> DET JONES: Why'd you shower? And that's just a generic question. Did you…was it…what was on you that made you need to shower?
> HERNANDEZ: The blood of the evil-doer.
> DET JONES: And is the evil-doer Vanessa? I haven't been up to the house. How is Vanessa…what…
> HERNANDEZ: I haven't been there…either.
> DET JONES: How did you leave her?
> HERNANDEZ: On the floor. In the room.
> DET JONES: Is there anything that…is distinguishing…about her? What's that?
> HERNANDEZ: Her head.
> DET JONES: What about her head?
> HERNANDEZ: It's no longer there.
> DET JONES: Is it still at the house? Where is it?
> HERNANDEZ: On the floor.

An autopsy performed on Cons's body revealed multiple stab wounds, including 11 stab wounds to her head and 18 stab wounds to her back. The back stab wounds appeared to be post-mortem and some of them were quite deep.

14

There were apparent defensive wounds to Cons's hands. The cause of death was multiple sharp force injuries. The evidence of assault was consistent with a crime of passion.

Of significance, also, is that this case was resolved by way of a bench trial upon stipulated evidence. Although Hernandez was charged with first degree murder, after considering all of the evidence and the presentations of counsel, the trial judge found him guilty of the lesser offense of second degree murder. This illustrates the decision-maker's retention of the capacity to afford Hernandez the benefit of a reasonable doubt.

The evidence against Hernandez was so overwhelming that no rational conclusion other than guilt, as found, could be reached. The State has proved beyond a reasonable doubt that any error made regarding shackling the defendant was harmless.

We affirm.

_____
Dwyer, J.

WE CONCUR:

_____    _____
Bowman, J.                   Andrus, A.C.J.